**In re Harold AMIDON and Yvonne Amidon, Debtors.**

**No. 09–02445–JDP.**

United States Bankruptcy Court, D. Idaho.

Feb. 2, 2010.

Joseph Ammirati, Nampa, ID, Attorney for Debtors.

Kathleen McCallister, Kuna, ID, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### Introduction

On August 17, 2009, Debtors Harold and Yvonne Amidon ("Debtors") filed a petition for relief under chapter 13 [1] of the Bankruptcy Code. Docket No. 1. The chapter 13 trustee, Kathleen McCallister ("Trustee"), objected to confirmation of Debtors' proposed plan, citing a host of issues. Docket No. 21. However, the parties agree that one, hotly-debated, threshold question must be resolved before the other confirmation issues should be addressed: whether, in calculating Debtors' monthly disposable income, they may deduct certain mortgage expenses on a home which they intend to surrender. *See* Docket No. 26.

Following a hearing on December 1, 2009, as agreed, the parties submitted a stipulation of material facts and written briefs outlining their legal arguments. Having reviewed the record, the arguments of the parties, and the applicable law, the Court concludes that in determining Debtors' monthly disposable income, they may not deduct mortgage expenses for a home they intend to surrender.[2]

---

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2. This Memorandum sets forth the Court's findings of fact and conclusions of law. Rules 7052, 9014.

## Facts[3]

On the same day that Debtors filed their petition, they filed a Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income, or Form B22C. Docket No. 5. In this form, Debtors list current monthly income of $6,959 (for an annual income of $83,508), which all parties agree is in excess of the applicable Idaho median income for a two-person household.[4] From this income, Debtors deducted a number of expenses, including $3,807[5] representing the total of payments on their first and second home mortgages. By their math, Debtors suggest they have a negative monthly disposable income of $337.

Debtors also filed their proposed chapter 13 plan on August 17, 2009. Docket No. 9. Although Debtors checked the box at the top of their Form B22C indicating that the applicable commitment period was five years, their plan proposes only 36 monthly payments of $1,200.[6] Under § 4.3 of their plan, Debtors propose to surrender their interest in their primary residence. In their bankruptcy schedules, Debtors indicate that the home has a current value of $350,000, and that it is secured by first and second mortgages with balances of $399,437 and $96,516, respectively.

Trustee contends that in calculating their monthly disposable income, Debtors should not be allowed to deduct the $3,807 mortgage payments on a house which they intend to surrender, and that instead, they should be limited to the $1,012 statutory housing allowance.[7] With those adjustments, Trustee asserts Debtors' Form B22C would reflect a positive monthly disposable income of $2,458. Debtors disagree with Trustee's position, contending that, under the Code, they may deduct the mortgage payments, and as a result may propose a 36 month plan.

## Decision

Trustee does not challenge Debtors' calculations regarding their current monthly income. Rather, Trustee targets Debtors' expense deductions. Trustee insists Debtors' plan cannot be confirmed.

Because Trustee has objected, and Debtors' plan does not propose to pay creditor claims in full, the Court cannot confirm their plan unless it provides that "all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). Although the Code does not define "projected disposable income," it defines "disposable income" as "current monthly income . . . less amounts reasonably necessary to be expended" for the support and maintenance of the debtor.

---

3. These facts are drawn primarily from the parties' stipulation of facts. Docket No. 30. Additional facts are gleaned from Debtors' petition and other pleadings, of which the Court may take judicial notice. Fed.R.Evid. 201.

4. At the time this bankruptcy case was filed, the median income for a household of two in Idaho was $51,946.

5. The monthly payment on Debtors' first mortgage is $3,064 and the monthly payment on Debtors' second mortgage is $743.

6. Under § 1325(b)(4)(A)(ii), the "applicable commitment period," or in other words, the minimum allowed term of a debtor's plan, is not less than 5 years if the debtor's current monthly income exceeds the applicable state's median family income, unless the plan proposes to pay all allowed unsecured claims in full.

7. On Schedule J, Debtors listed a housing expense of $1,800.

11 U.S.C. § 1325(b)(2). Furthermore, for above-median income debtors, the Code requires that "[a]mounts reasonably necessary to be expended ... shall be determined in accordance with subsections (A) and (B) of section 707(b)(2)[.]" 11 U.S.C. § 1325(b)(3).

Under § 1325(a)(5)(C), a chapter 13 debtor may, under a plan, propose to treat an allowed secured claim by "surrender[ing] the property securing such claim to such holder[.]" In calculating monthly disposable income, bankruptcy courts have split on the propriety of deductions for secured debt payments that will not exist on a "going-forward basis" under a debtor's plan, *i.e.*, when the collateral securing the debt is being surrendered through that plan. *See generally* Hon. Ray C. Mullins & Elizabeth B. Rose, *Perfectly Clear or Clear as Mud? A Review of Selected BAPCPA Consumer Issues*, 2008 Norton Annual Survey of Bankr.Law Part II, § 1 n. 23 (collecting cases). This division in authority has been profound in this Circuit.

For example, just prior to Debtors' bankruptcy filing, in a case factually similar to this one, this Court addressed this very issue. *See In re Varner*, 09.2 I.B.C.R. 52 (Bankr.D.Idaho 2009). In a thoughtful, reasoned decision, Chief Judge Myers ultimately concluded the debtor in that case could deduct payments for secured debt when calculating her disposable income, despite her intention to surrender the property securing the debt and discontinue making payments under her chapter 13 plan. *In re Varner*, 09.2 I.B.C.R. at 54. In reaching that conclusion, Chief Judge Myers noted that even after the Ninth Circuit decision in *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868 (9th Cir.2008), there was arguably room to hold that expenses should be viewed through a forward-looking, rather than historical lens.[8] *In re Varner*, 09.2 I.B.C.R. at 54. At least one bankruptcy court had taken that approach, *see In re Reyes*, 401 B.R. 910, 913–14 (Bankr.C.D.Cal.2009), while another bankruptcy court disagreed, opting for a consistent approach to both the income and the expense side of the calculus. *See In re Smith*, 401 B.R. 469, 474 (Bankr.W.D.Wash.2008) (noting "it would ... be inconsistent to apply a backward-looking approach to income, yet adopt a forward-looking approach in determining expenses."). Chief Judge Myers found the analysis in *Smith* to be more persuasive, and reached the same conclusion as that court.[9] *In re Varner*, 09.2 I.B.C.R. at 54.

However, following this Court's decision in *Varner*, the Ninth Circuit issued its decision in *Ransom v. MBNA, America Bank, N.A. (In re Ransom)*, 577 F.3d 1026 (9th Cir.2009). In *Ransom*, the issue was whether a debtor who owned his auto free and clear of encumbrances or lease obligations could nonetheless take a vehicle

---

**8.** In *Kagenveama*, the Ninth Circuit rejected the trustee's argument that § 1325(b)(1)(B) requires a forward-looking determination of projected disposable income. *Id.* at 873–74. In addition, the Ninth Circuit rejected the argument that the disposable income calculation of § 1325(b)(2) was a presumptive starting point which could be supplemented by evidence of future or actual finances of the debtor. *Id.* at 874. However, as Chief Judge Myers pointed out in *Varner*, *Kagenveama* was primarily focused on income, and did not

directly address the expense side of the calculus.

**9.** As noted in the *Varner* decision, *Smith* was appealed to the Ninth Circuit Bankruptcy Appellate Panel. *See Am. Express Bank, FSB v. Smith (In re Smith)*, 418 B.R. 359 (9th Cir BAP 2009). However, at the time this Court issued its decision in *Varner*, the BAP had conducted oral argument in *Smith*, but had not yet ruled. On October 5, 2009, the BAP issued its decision in *Smith*. *Id.* The BAP's decision and analysis is discussed below.

ownership deduction when calculating his disposable income. The Ninth Circuit held that he could not, noting how ironic it would be if a debtor were allowed to diminish payments to unsecured creditors based on a fictitious expense that was not incurred by that debtor. *Ransom,* 577 F.3d at 1026.

Then, shortly thereafter, the Ninth Circuit Bankruptcy Appellate Panel issued its decision concerning the Washington case in which the Panel reversed the bankruptcy court decision in the debtor's favor. *Smith,* 418 B.R. at 359. In *Smith,* the majority explained that it would "not read *Kagenveama* as binding precedent with respect to the calculation of expenses under sections 1325(b)(2) and (b)(3)." *Id.* at 366. As a result, it reasoned "the [*Kagenveama*] opinion does not bind us to a rule of how to determine the expenses that must be applied to the income side of the equation, nor does it compel us to impose a symmetry that neglects the reality of the case before us[.]" *Id.* at 367–68.

In *Smith,* the majority explained that § 1325(b)(2) and (b)(3) perform distinct functions and must be viewed in sequence. Subsection (b)(2) focuses on what expenses the debtor determines are necessary, and once that is established, subsection (b)(3) governs what amount of those expenses may be deducted from a debtor's current monthly income. *Smith,* 418 B.R. at 369. Viewed in this manner, these subsections require a two-step inquiry:

> [I]f an expense is not reasonably necessary for the debtor's and/or dependants'

maintenance and support, the inquiry ends at section 1325(b)(2) as there is no "amount" to determine in section 707(b)(2) via section 1325(b)(3) . . . .

> If the expense is reasonably necessary for the debtor's and/or dependants' maintenance and support, then section 1325(b)(3) requires the court to determine the *amount* in accordance with section 707(b)(2).

*Smith,* 418 B.R. at 368 (emphasis in original). In *Smith,* the debtors proposed to surrender two houses and one vehicle. The majority reasoned that by virtue of their decision to surrender that property, the debtors had themselves determined that the associated expenses were not reasonably necessary for their support and maintenance, and as a result, § 1325(b)(3) never came into play.[10]

■ Aside from the amount of property being surrendered and the amounts involved, there are no real factual distinctions between this case and *Varner.* Indeed, were it not for the *Ransom* and *Smith*[11] decisions, there would be little reason for this Court to deviate from the teachings of *Varner.* However, these appellate decisions significantly altered the existing chapter 13 landscape. Is *Varner* good law after *Ransom? Smith* indicates the later Ninth Circuit decision compels a re-examination of the issues, and a different result.

At bottom, this Court need not indulge in extensive statutory construction and analysis, since the respective virtues and limitations of the parties' positions have

---

10. Judge Hollowell authored an impressive dissent in *Smith* indicting the majority's decision to read §§ 1325(b)(2) and (3) sequentially as an exercise in "contorted statutory analysis." *Smith,* 418 B.R. at 371.

11. The BAP's decision in *Smith* has been appealed, but the Ninth Circuit's public docket indicates that the appeal remains in its early

stages such that no decision is imminent. Thus, there is no justification to await further instruction on this issue, even though the question is a difficult one, and ultimately, the Ninth Circuit may determine that the course elected by the BAP in *Smith* and by this Court here, is flawed.

been amply explored in these and other reported decisions concerning this issue. While the analysis in *Varner* and the dissent in *Smith* are both highly defensible, under the circumstances, this Court is persuaded to follow the approach taken by the *Smith* majority.[12] At the end of the day, the Court prefers the common-sense interpretation given to the Code in *Smith*, an approach that is seemingly encouraged in *Ransom*, albeit arguably at odds with the more mechanical application of the Code adopted earlier by the court of appeals in *Kagenveama*. In other words, like in *Smith*, Debtors have determined that their home is not reasonably necessary for their support by virtue of their decision to surrender it through their plan. Because the Code dictates that only reasonably necessary expenses may be deducted, Debtors should not be able to deduct phantom first and second mortgage payments when calculating their monthly disposable income. Simply put, like the *Ransom* court, this Court declines to allow Debtors to significantly reduce payments to their unsecured creditors based upon fictitious expenses.

**12.** A comment is required at this point concerning whether BAP decisions are binding upon this Circuit's bankruptcy courts. This bankruptcy judge currently serves as a member of the Ninth Circuit's BAP. Having observed the workings of the Panel, and being familiar with those bankruptcy judges who staff BAP panels, this judge is inclined to give great deference to the Panel's decisions. Of course, the Ninth Circuit has declined to rule on whether bankruptcy courts are bound by the decisions of the BAP. *See Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir.1990). In the same decision, however, the court of appeals unremarkably held that BAP decisions are not binding on district courts. *Id.* The BAP, on the other hand, has decided its case law has precedential value in the circuit's bankruptcy courts. *See, e.g., In re Windmill Farms, Inc.*, 70 B.R. 618, 622 (9th Cir.BAP1987) *rev'd on other grounds*, 841 F.2d 1467 (9th Cir.1988). In addition, scholars point to persuasive policy arguments favoring the binding effect of BAP case law.

## Conclusion

For these reasons, Trustee's objection to confirmation of Debtors' current plan will be sustained, and confirmation denied. A separate order will be entered requiring that Debtors file an amended plan and an amended Form B22C on or before February 19, 2010. Counsel for Debtors shall insure that a hearing on confirmation of the amended plan shall be scheduled for a confirmation hearing on the next available date.

*See, e.g.,* Thalia L. Downing Carroll, *Why Practicality Should Trump Technicality: A Brief Argument for the Precendential Value of Bankruptcy Appellate Panel Decisions*, 33 Creighton L.Rev. 565, 573–578 (2000) (noting "When BAP decisions have no precedential value whatsoever, the judicial system is diminished. If bankruptcy courts, district courts, and BAPs are all allowed to formulate their own decisions on issues of law, a plethora of law will be created and much time will be wasted with little benefit. The public will not know how to plan their affairs and the judiciary itself will be unsure of which law to follow."). While this is an interesting debate, it is a question for the Ninth Circuit, not this bankruptcy judge, to authoritatively resolve. In this case, it is enough that this Court is simply persuaded the majority in *Smith* called the question correctly as a basis for adopting its resolution. If Debtors disagree, as noted in *Bank of Maui*, they can solicit the district court's views on this complex issue.